IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

```
DANIEL G. B.,                      )
                                   )
           Plaintiff,              )
                                   )
      v.                           )          1:23CV760
                                   )
MARTIN J. O'MALLEY,                )
Commissioner of Social Security,   )
                                   )
           Defendant.[1]           )
```

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff, Daniel G. B., brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security (the "Commissioner"), denying Plaintiff's claim for Supplemental Security Income ("SSI"). (Docket Entry 1.) The Commissioner has filed the certified administrative record (Docket Entry 4 (cited herein as "Tr. __")), and both parties have submitted dispositive briefs in accordance with Rule 5 of the Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g) (Docket Entries 8, 9). For the reasons that follow, the Court should enter judgment for the Commissioner.

---

[1] On December 20, 2023, President Joseph R. Biden, Jr., appointed Martin J. O'Malley as Commissioner of the Social Security Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin J. O'Malley should substitute for Kilolo Kijakazi as Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## I.  PROCEDURAL HISTORY

Plaintiff applied for SSI on October 13, 2020 (Tr. 225-31), alleging a disability onset date of August 11, 2002 (see Tr. 225).[2] Upon denial of that application initially (Tr. 82-93, 110-14) and on reconsideration (Tr. 94-104, 118-20), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 121-23).  Plaintiff, his attorney, and a vocational expert ("VE") attended the hearing.  (Tr. 33-81.)  The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 13-32.)  The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 222-24), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

> 1. [Plaintiff] has not engaged in substantial gainful activity since October 13, 2020, the application date.
>
> . . .
>
> 2. [Plaintiff] has the following severe impairments: bilateral pes planus; bilateral knee degenerative joint disease; right ankle degenerative joint disease; obesity; attention deficit hyperactivity disorder ("ADHD"); autism

---

[2] Notwithstanding Plaintiff's alleged onset date of August 11, 2002, Plaintiff lacked eligibility for SSI benefits until his application date of October 13, 2020 (see Tr. 225).  See 20 C.F.R. § 416.202 (explaining that a claimant remains ineligible for SSI benefits until date he or she files SSI application); 20 C.F.R. § 416.501 (stating that a claimant may not receive SSI benefits for any period that predates first month he or she satisfies eligibility requirements, which cannot precede application date).

spectrum disorder; [and] obsessive compulsive disorder ("OCD").

. . .

3. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

4. . . . [Plaintiff] has the residual functional capacity to perform light work . . . except frequently climb ramps and stairs, but only occasionally climb stepladders up to four vertical feet in height; no climbing of higher ladders or of ropes/scaffolds of any height; frequently balance, stoop, and crawl; occasionally kneel and crouch; occasionally push, pull, and use foot controls with the bilateral lower extremities; occasional exposure to vibration and high, exposed places; limited to work needing little or no judgment to do simple duties that can be learned on the job or in a short period of time, usually within 30 days, and for which little specific vocational preparation and judgment are needed; limited to work requiring sustained concentration and persistence for no greater than approximately two hours at a time, and which is not performed on an assembly line or at a similar production-pace; occasional changes to the work setting and the manner and method of performing the assigned work; work that provides for two 15-minute breaks and one 30-minute break for each eight-hour shift worked, occurring at such times as directed by the employer; no more than occasional interactions with supervisors, coworkers, and the public.

. . .

5. [Plaintiff] has no past relevant work.

. . .

9. Considering [Plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [he] can perform.

> . . .
>
> 10. [Plaintiff] has not been under a disability, as defined in the [] Act, since October 13, 2020, the date the application was filed.

(Tr. 18-27 (bold font and internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

### A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla

4

of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any

5

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id.

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' *i.e.*, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174

---

[3] The Act "comprises two disability benefits programs. The Disability Insurance Benefits Program provides benefits to disabled persons who have contributed to the program while employed. [SSI] provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

6

F.3d 473, 475 n.2 (4th Cir. 1999).[4] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." Id. at 179.[5] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. See id. at 179-80. However, if the

---

[4] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

7

claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[6]

## B. Assignment of Error

In Plaintiff's sole issue on review, he asserts that "the ALJ did not acknowledge or discuss the medical opinion contained within the narrative portion of [Plaintiff's Individualized Education Program ('IEP')]." (Docket Entry 8 at 1 (block formatting omitted).) More specifically, Plaintiff points out that "[t]he IEP summarized a February 2017 report from 'Psychologist A. Collins'" ("2017 Collins Report"), in which Dr. Collins noted "that [he] provided counseling sessions with [Plaintiff] every other week during the school year to address anxiety and improve performance"

---

[6] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

(id. at 6 (quoting Tr. 539)), and provided a number of observations regarding Plaintiff's difficulties in completing school assignments (see id. at 6-8 (citing and quoting Tr. 539)). According to Plaintiff, although the ALJ discussed and discounted the IEP team's opinion that Plaintiff's "lack of focus and lack of organization skills w[ould] hinder his ability in the work force" (id. at 8 (citing Tr. 25 (in turn citing Tr. 518))), "the ALJ did not mention . . . [or] evaluate the supportability or consistency of [the 2017 Collins Report]" (id.). Plaintiff deems the ALJ's error "harmful because [the 2017 Collins R]eport shows limitations greater than those accounted for in the RFC" (id. at 12). Those contentions lack merit.

For benefits applications filed on or after March 27, 2017 (such as Plaintiff's (see Tr. 225-31)), the SSA has enacted substantial revisions to the regulations governing the evaluation of opinion evidence, see Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017). Under the new regulations, ALJs need not assign an evidentiary weight to medical opinions and prior administrative medical findings or accord special deference to treating source opinions. See 20 C.F.R. § 416.920c(a) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a

9

claimant's] medical sources").[7]  Instead, an ALJ must determine and "articulate in [the] . . . decision how <u>persuasive</u> [he or she] find[s] all of the medical opinions and all of the prior administrative medical findings in [a claimant's] case record." 20 C.F.R. § 416.920c(b) (emphasis added).  Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually."  20 C.F.R. § 416.920c(b)(1).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors" and thus the ALJ must address those two factors in evaluating the persuasiveness of an opinion or a finding.  20 C.F.R. § 416.920c(b)(2).[8]  The ALJ must only address the three other persuasiveness factors — the nature and extent of the medical

---

[7] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental, or other demands of work activity or to adapt to environmental conditions.  20 C.F.R. § 416.913(a)(2).  Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review."  20 C.F.R. § 416.913(a)(5).

[8] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation."  Revisions to Rules, 82 Fed. Reg. at 5853; <u>see also</u> 20 C.F.R. § 416.920c(c)(1).  "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim."  Revisions to Rules, 82 Fed. Reg. at 5853; <u>see also</u> 20 C.F.R. § 416.920c(c)(2).

10

source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict" the opinion/finding, 20 C.F.R. § 416.920c(c)(3)-(5) — when the ALJ finds two or more opinions or findings about the same issue "[e]qually persuasive" in terms of supportability and consistency, 20 C.F.R. § 416.920c(b)(3).

Here, Plaintiff's IEP materials include a "Reevaluation Report" dated March 9, 2020 (Tr. 538-41), which reflects Plaintiff's grade as "[t]welfth" and age as "17" (Tr. 538). That Report contains a "Record Review" (id. (underscoring omitted)) which, in turn, includes summaries of <u>historical</u> data regarding Plaintiff's "[a]ttendance" (id.), "[p]ast and current grades/work samples" (id.), "[r]esults of local and state assessment data" (id.), "[r]elevant medical/health information" (Tr. 541), "[d]iscipline reports" (id.), and "IEP [p]rogress" (id.). The "[r]esults of local and state assessment data" section quotes the 2017 Collins Report, dated "<u>2/1/2017</u>" (Tr. 539 (emphasis added)), as follows:

> I have been providing <u>counseling sessions</u> with [Plaintiff] every other week <u>for this school year</u> to address his anxiety and work with improving school performance. Ms. Megan Menias, the mental health professional has been meeting with him on the other weeks to address the same concerns. [Plaintiff] will participate, though it is difficult to get beyond a superficial level. [Plaintiff] fails to complete simple assignments (Daily Journal), but will meet with me without great reservation. Teacher and other staff input indicate that [Plaintiff] is working at a very slow pace and fails to complete even minimal standards when work is

11

modified well below age and grade level expectations. [Plaintiff] appears overwhelmed and does not seem willing to take even the initial steps to improve his current standing. When questioned about specific details on work, he wants to talk in generalities about how he has somehow lost some intelligence over the past few years. He insists that the work is not too hard and that he can master the work and maintains this belief even when confronted with performance data. [Plaintiff] is failing to complete basic assignments and only received one credit in the first semester.

[Plaintiff] appears to be overwhelmed and gets easily preoccupied. He insists that he is working at his quickest pace, but when questioned about his time management, he becomes defensive and rationalizes his behavior. When given time management strategies, he fails to put them into practice. Even when working one on one, [Plaintiff] will only complete partial work at a very slow pace. [Plaintiff] blames his poor performance on the over-use of technology in instruction and complains that he does better with pencil-n-paper instruction. He states that he needs text books and worksheets. However, when this instruction modality has been employed, his performance is unchanged. He reports that he is frustrated with the way things are going, but after you feel you have a break through and he can identify problems and potential solutions, the next week, he is unable to recall what was discussed and the process starts all over.

It is apparent that [Plaintiff]'s anxiety overwhelms him at times an[d] significantly impedes his performance. The IEP team can look to see if formally adding counseling as a related service would be beneficial. However, [Plaintiff]'s anxiety appears to be a long term issue and may require more intensive therapy than is going to be provided in the school setting. The parents may want to pursue private counseling that employs cognitive behavioral therapy to help him learn personal coping strategies that help him reduce his anxiety. While some mild improvement has been noted in socialization, [Plaintiff]'s anxiety and increased depressive symptoms appear to be impacting daily

performance.  His anxiety and frustration i[s] now impacting his relationship with his family and others.

(Id. (emphasis added).)

The ALJ discussed Plaintiff's IEP materials, including some of the statements in the 2017 Collins Report, as part of the ALJ's evaluation of "the intensity, persistence, and limiting effects of [Plaintiff's mental] symptoms."  (Tr. 22; see also id. (noting that Plaintiff "was in regular education classes in school, with accommodations for test-taking," that he "successfully graduated high school in May 2020," that "[h]e was noted to engage in critical thinking, and he had well balanced social/peer relationships despite some difficulty understanding unwritten social rules," and that, "[w]hile he struggled with organization, time management, and maintaining focus, his reading and writing skills were noted as 'amazing' or 'outstanding'" (citing Tr. 516, 518, 522-24, 526, 530, 533-35, 539-40) (emphasis added) (internal parenthetical citation omitted)), 23 (observing that, on the Wechsler Intelligence Scale for Children, Fifth Edition ("WISC-V"), Plaintiff's "full scale IQ appear[ed] average in the 32nd percentile with a score of 93," that "verbal comprehension, visual-spatial skills, fluid reasoning, and working memory [we]re all average," and that "processing speed [wa]s low average" (citing Tr. 539)).)  Thereafter, the ALJ evaluated the persuasiveness of the IEP materials as follows:

13

> [Plaintiff]'s 2020 [IEP] notes that his lack of focus and lack of organization skills will hinder his ability in the workforce. [(Tr. 518.)] This is slightly persuasive, as this statement, broadly construed, is supported by [Plaintiff]'s low processing speed and poor time management skills ([Tr. 539]), and consistent with his Adderall use[ (Tr. 585)]. However, the statement was not made by an acceptable medical source, and further, it lacks any specific work activity limitations stemming from [Plaintiff]'s deficits in focus and organization skills. 20 [C.F.R. § ]416.913(a)(2). Thus, while the [ALJ] does assign limitations to account for these deficiencies, this statement is not particularly useful or probative in helping to determine those limitations. Accordingly, it is of limited persuasive value.

(Tr. 25.) For the reasons described more fully below, the ALJ did not prejudicially err by failing to expressly evaluate the persuasiveness of the 2017 Collins Report.

As an initial matter, the Commissioner contends that the 2017 Collins Report does not qualify as a "medical opinion" under the regulations, because 1) "it is unclear if A. Collins meets the definition of 'acceptable medical source,' 'medical source,' or 'nonmedical source,'" (Docket Entry 9 at 10 (quoting 20 C.F.R. § 416.902(a), (i), (j))), and 2) because the statements in the 2017 Collins Report "relate to Plaintiff's functioning in an academic setting, which is not relevant to whether he has a work-related limitation as an adult" (id. at 12). Those contentions fail on both fronts.

"A medical opinion is a statement from a medical source about what [Plaintiff] can still do despite [his] impairment(s) and whether [he] ha[s] one or more impairment-related limitations or

14

restrictions in . . . [his] ability to perform mental demands of work activities.  20 C.F.R. § 416.913(a)(2) (emphasis added).  In turn, the regulations define a "medical source" to include "an individual who is certified by a State as a . . . <u>school psychologist</u> and acting within the scope of practice permitted under State or Federal law."  20 C.F.R. § 416.902(i) (emphasis added).

Here, Plaintiff's IEP materials identify the author of the 2017 Collins Report as "<u>Psychologist</u> A. Collins[]" under the heading "<u>Counseling</u> Evaluation," and the 2017 Collins Report begins with Dr. Collins' statement that "[he] ha[d] been providing <u>counseling</u> sessions with [Plaintiff] every other week <u>for this school year</u> to address his anxiety and work with improving school performance."  (Tr. 539 (emphasis added).)  Accordingly, Dr. Collins "was [P]laintiff's school psychologist, and, therefore, a medical source" under the regulations. <u>Tyler W. v. Commissioner of Soc. Sec.</u>, No. 3:22CV1345, 2024 WL 1075209, at *4 (N.D.N.Y. Mar. 12, 2024) (unpublished) (citing 20 C.F.R. § 416.902(i)).

The Commissioner's assertion that the 2017 Collins Report does not constitute a "medical opinion," because it addresses Plaintiff's <u>school</u> functioning rather than his <u>work</u> functioning (Docket Entry 9 at 10-12) fares no better.  The Court should find persuasive the reasoning of another district court that recently rejected a similar argument advanced by the Commissioner:

15

> Contrary to the Commissioner's contentions, [the school psychologist]'s evaluation of [the] plaintiff's "school limitations" is relevant to his ability to perform work-related functions. Under the regulations, the mental demands of work activities include[] an individual's ability to maintain concentration, persistence, or pace. . . . [The school psychologist] opined that [the] plaintiff <u>works much slower than other students his age</u> and he needs extra time to complete tasks due to his low processing speed abilities. In doing so, [the school psychologist] provided an opinion on [the] plaintiff's ability to maintain concentration, persistence, or pace, which is directly relevant to his ability to perform mental demands of work activities.
>
> Further, the SSA has promulgated specific guidance with respect to the evaluation of disability in young adults, who it defines as people between the ages of 18 to approximately 25. Specifically, the SSA has addressed the task of extrapolating a young adult's work-related limitations from his performance in school. Social Security Ruling [] 11-2p[, <u>Titles II and XVI: Documenting and Evaluating Disability in Young Adults</u>, 2011 WL 4055665 (Sept. 12, 2011) ("SSR 22-2p"),] provides that "<u>evidence about a young adult's functioning from school programs, including IEPs, may indicate how well a young adult can use his or her physical or mental abilities to perform work activities</u>." One "example of school-reported difficulties that might indicate difficulty with work activities" is an individual's "difficulty with maintaining attention for extended periods in a classroom." SSR 11-2p is binding on ALJs.

<u>Tyler W.</u>, 2024 WL 1075209, at *4–5 (quoting SSR 11-2p, 2011 WL 4055665, at *7) (emphasis added) (internal quotation marks, citations, ellipses, and brackets omitted).

As in <u>Tyler W.</u>, the 2017 Collins Report contains Dr. Collins' assessment that Plaintiff "work[ed] at a very slow pace," and description of him as "overwhelmed" and "easily preoccupied" (Tr. 539), both of which bear on Plaintiff's "ability to perform mental demands of work activities, such as . . . maintaining

16

concentration, persistence, or pace," 20 C.F.R. § 416.913(a)(2)(i)(B). Accordingly, the 2017 Collins Report constitutes a "medical opinion" under Section 416.913(a)(2), and the ALJ should have expressly evaluated the persuasiveness of that opinion, see 20 C.F.R. § 416.920c(b) (providing that ALJ "will articulate in [his] determination or decision how persuasive [h]e find[s] all of the medical opinions . . . in [the] case record"). For the following three reasons, however, the ALJ's error remains harmless under the factual circumstances of this case. See generally Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result").

First, although the ALJ did not explicitly evaluate the persuasiveness of the 2017 Collins Report (see Tr. 24-25), the ALJ did discuss and find "of limited persuasive value" (Tr. 25) the opinion of Plaintiff's IEP team that Plaintiff's "lack of being focused and organization skills will hinder him . . . in the work force" (Tr. 518). That latter opinion, dated March 9, 2020 (see Tr. 525), and located under the heading, "Present Level of Performance" (Tr. 518 (emphasis added)), reflects Plaintiff's academic functioning just six months prior to Plaintiff's SSI application date (see Tr. 225) and thus constitutes a much more

17

recent assessment of Plaintiff's abilities than the 2017 Collins Report prepared in February 2017 (see Tr. 539).[9] Notably, Plaintiff challenged neither the ALJ's analysis of the March 2020 IEP team's opinion, nor the ALJ's decision to assign "limited persuasive value" to that opinion (Tr. 25). (See Docket Entry 8.)

Second, although Dr. Collins stated that he "provid[ed] counseling sessions with [Plaintiff] every other week for th[e 2016-17] school year" (Tr. 539), the record contains neither any of Dr. Collins' treatment notes from those sessions, nor the statements of unidentified "[t]eacher[s] and other staff" who offered "input" to Dr. Collins regarding Plaintiff's school performance (id.). Under these circumstances, the 2017 Collins Report's lack of "supportability," one of the two "most important factors" in the evaluation of medical opinions, 20 C.F.R. § 416.920c(a), undermines its persuasiveness.

Third, the 2017 Collins Report lacks "consistency," the other "most important factor[]" in medical opinion evaluation, id., with significant evidence in the record, which further undercuts its persuasiveness. The ALJ credited the opinions of the state agency psychological consultants that Plaintiff "ha[d] some issues staying

---

[9] The 2017 Collins Report, prepared in February 2017, reflects Plaintiff's academic performance and mental functioning at just 14 years old as a freshman in early college high school. (See Tr. 539.) Notably, the record reflects that Plaintiff struggled with the transition from middle school to an early college high school. (See, e.g., Tr. 339 (11/14/16 child neurology consultation reflecting that Plaintiff had made As, Bs, and Cs in middle school, but that, since starting "high school in a special program at a local community college," Plaintiff "had to adapt to a new school and a new campus," "[t]he course work was much more difficult for him," and he "began to have hallucinations").)

18

organized which m[ight] lead to concentration and persistence challenges [but] not to the extent to preclude [simple, routine, and repetitive tasks ('SRRTs')]" (Tr. 91), and that Plaintiff "m[ight] have some lapses in sustained contention due to his [mental health] signs and physical problems, but can maintain concentration, persistence, and pace to stay on task for 2-hour periods as required to perform [SRRTs] at a non-production pace" (Tr. 102). Moreover, the ALJ noted that, despite Plaintiff's assertions of disabling mental symptoms, "mental status examinations remained unremarkable, with only sleep problems noted" (Tr. 22 (citing Tr. 583, 585, 772, 774, 776, 782, 784)), and Plaintiff's primary care physician described Plaintiff's autism spectrum disorder as "stable" (id. (citing Tr. 672, 688)). The ALJ also highlighted Plaintiff's abilities to graduate from high school, attend college classes, work part-time bussing tables in a restaurant, cook for himself, and drive with accompaniment (see Tr. 22-23), all of which contrast sharply with the 2017 Collins Report's description of Plaintiff as unable "to complete basic assignments," "overwhelmed," "anxi[ous]," "preoccupied," and "depress[ed]" (Tr. 539).

In light of the foregoing analysis, the ALJ's failure to evaluate the persuasiveness of the 2017 Collins Report constitutes harmless error, and Plaintiff's first and only assignment of error thus provides no basis for relief.

19

## III. CONCLUSION

Plaintiff has not established an error warranting remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, and that this action be dismissed with prejudice.

<u>  /s/ L. Patrick Auld  </u>
**L. Patrick Auld
United States Magistrate Judge**

May 14, 2024